**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

JOSE FLORES,

       Plaintiff,

v.                                               Case No. 6:20-cv-778-WWB-EJK

CFI RESORTS MANAGEMENT, INC.,

       Defendant.

_____/

**ORDER**

THIS CAUSE is before the Court on Defendant's Motion for Summary Judgment (Doc. 42), Plaintiff's Response (Doc. 44), and Defendant's Reply (Doc. 45).  For the reasons set forth herein, Defendant's Motion will be granted in part and denied in part.

**I.    BACKGROUND**

Plaintiff, Jose Flores, was hired by Defendant CFI Resorts Management, Inc. in July 2015 to work as a line cook at Westgate Lakes Resort & Spa ("**Westgate Lakes**"). (Doc. 42-1 at 3).  In January 2016, Flores became the personal chef to Defendant's owner, David Siegel, and his family.  (*Id.*; Doc. 42-2 at 171:19–172:3).  In that role, Flores prepared the family's meals during the week and prepared food for parties.  (Doc. 42-2 at 34:21–24, 114:3–11, 123:4–10, 171:19–23, 201:3–9).

Flores states that while he was working at the Siegel home, Jaqueline Siegel, David Siegel's wife, had a habit of sexually harassing him when she was intoxicated.  (*Id.* at 184:5–20).  The harassment began when he started at the Siegel residence and continued until his transfer to Drafts Sports Bar & Grill ("**Drafts**") located in Westgate Lakes.  (Doc. 42-1 at 3–4; Doc. 42-2 at 15:1–5, 38:12–17, 59:11–15, 184:5–185:9,

196:24–197:2).  In January 2016, Mrs. Siegel approached Flores while he was cooking breakfast and rubbed his back in a circular motion while telling him that she was glad to have a Latin chef because he must be a good lover.  (Doc. 42-2 at 18:12–14, 54:12–55:16, 59:11–60:1).  While at a Halloween party, Mrs. Siegel, dressed as a nurse, flashed her breasts at Flores when he told her he was not feeling well and asked, "You feel better now?"  (*Id*. at 21:20–22:11).  On other occasions, Mrs. Siegel asked Flores how she looked in her baby-doll nightgown and disrobed and scratched her butt in front of Flores.  (*Id*. at 195:17–196:13).  When she was intoxicated, Mrs. Siegel would pass by Flores while he was cooking and rub herself against his penis.  (*Id*. at 216:15–25).

The day after the Super Bowl in either 2016, 2017, or 2018,[1] Mrs. Siegel kissed Flores near his mouth while he was in the kitchen and asked him to tuck her into bed.  (*Id*. at 200:5–13, 202:17–203:8, 203:24–204:4).  Flores agreed to assist Mrs. Siegel to her bedroom, where Mrs. Siegel masturbated in front of Flores and asked him to touch her breast.  (*Id*. at 204:13–205:6, 207:24, 208:4–9).  Mrs. Siegel told Flores that he had to listen to her because she was his boss.  (*Id*. at 205:3–4, 207:15–20).  Flores told a co-worker about the incident, but he did not tell a supervisor until 2019.  (*Id*. at 209:10–23, 210:11–19).  Mrs. Siegel receives a paycheck from Defendant and has leverage regarding employment decisions.  (Doc. 44-1 at 7:22–8:3; Doc. 44-3 at 20:20–24, 37:4–5, 38:2–7).

When the harassment began in 2016, Flores reported it to his superiors; executive chef David Clark, director of food and beverage Tom Gentile, and food and beverage

---

[1] Flores could not recall what year this incident occurred, but the evidence establishes that he worked the day after the Super Bowl in 2016, 2017, and 2018, but not in 2019.  (Doc. 42-1 ¶ 8; Doc. 42-2 at 201:15–17).

administrator Maria Fernandez.  (Doc. 42-2 at 11:1–16; Doc. 44-3 at 25:3–11; Doc. 44-5, ¶¶ 6–9).  Thereafter, Clark informed Mike Lodge, the Vice President of Culinary and Restaurant Operations, of Flores' complaints and Lodge stated he would take care of it. (Doc. 44-3 at 26:2–13; Doc. 44-5, ¶ 10).  However, when Flores spoke to Lodge directly about the harassment in the middle of 2016, Lodge told him to ignore it and just do his job.  (Doc. 42-2 at 47:5–17).  Flores also told other managers and supervisors about Mrs. Siegel's behavior, including Peterly Jean, Stephanie Hartman, and Peter Triana.  (*Id.* at 13:11–14, 16:6–10, 17:23–18:1).  Specifically, Flores told Triana and Hartman that Mrs. Siegel was coming onto him and touching him while he was preparing breakfast and that she told him she was glad to have a Latin chef and that Flores must be a good lover.  (*Id.* at 18:10–16, 20:1–15).

Flores testified that the harassment briefly stopped in 2016 after he told his supervisor, (*id.* at 184:5–14), and that it slowed down in 2017 and 2018 because Mrs. Siegel had an interest in someone else, (*id.* at 197:3–19, 199:7–12).  Although Flores testified that the behavior recommenced after 2018, he could not give a specific timeframe.  (*Id.* at 199:7–17).

In late 2018 or early 2019, Flores told Mrs. Siegel that he had enough and wanted the harassment to stop.  (*Id.* at 172:21–24, 173:15–25).  Thereafter, Flores claims that Mrs. Siegel complained about his work and became more demanding.  (*Id.* at 172:24–25, 174:3–11).  The other staff, wanting to please Mrs. Siegel, stopped speaking to Flores and treated him differently.  (*Id.* at 172:20–173:3, 173:11–14).  Mrs. Siegel acknowledged that in February 2019 she had her assistant contact Hartman to ask where Flores was working because he was hardly at the house.  (Doc. 44-1 at 15:17–16:21).  And in March

2019, Mrs. Siegel requested that Flores prepare breakfast, lunch, and dinner because he was being paid to be the chef for the Siegel house but was never there.  (*Id.* at 19:2–17).  The Siegel's house manager, Wendy Ponce Tenerio, informed Mrs. Siegel that Flores did not come to work.  (Doc. 44-2 at 32:19–33:4).

On April 12, 2019, Lodge and Hartman met with Flores to discuss issues the Siegels had with Flores' food preparation, that Mrs. Siegel wanted him to remain at the Siegel household longer than his assigned shift, and that he was leaving the Siegel household before his shift ended.  (Doc. 42-2 at 176:5–177:4; Doc. 42-3 at 5).  Lodge advised Flores to report to Hartman about any problems or concerns he had at the Siegels.  (Doc. 42-2 at 177:15–18).  Flores did not mention sexual harassment at that meeting.  (*Id.* at 177:19–23; Doc. 42-3 at 6).  Three days later, on April 15, 2019, Flores contacted Diana Triana and filed a written complaint alleging Mrs. Siegel sexually harassed him.  (Doc. 42-2 at 161:17–162:1, 175:17–20; Doc. 42-3 at 6).

After Flores made his formal complaint, he was informed that he did not have to report back to the Siegel household and he was allotted time off to take care of his marital situation.  (Doc. 42-2 at 161:7–14, 162:2–22, 163:8–21; Doc. 44-7 at 63:21–64:2).  Thereafter, Lodge transferred Flores to Drafts.  (Doc. 44-7 at 64:18–65:6).  Because Drafts was fully staffed at the time, Lodge created a position for Flores to accommodate his existing schedule and position.  (Doc. 42-3 at 6).  Flores' schedule, job title, and compensation remained the same after his transfer to Drafts.  (Doc. 42-2 at 165:6–17, 224:5–9).  In fact, Lodge made it clear to Flores that he would work Monday through Friday, no weekends, and the same hours as he had at the Siegels' home.  (*Id.* at 165:10–

17, 166:1–21).  Flores had no further contact with Mrs. Siegel after he was transferred to Drafts.  (*Id.* at 151:10–25; 152:9–21).

Although Flores admitted that his schedule was favorable and his salary and benefits had not changed, he considered his transfer and schedule to be retaliation.  (*Id.* at 219:6–220:14).  He explained that his co-workers treated him differently because his schedule differed from theirs.  (*Id.* at 165:18–25; 167:14–18).  Furthermore, after his transfer, he was not called for meetings, he was not acknowledged by Lodge, and he was not informed of daily issues pertinent to his job.  (*Id.* at 220:15–221:3).  He clarified that he was "not precluded from doing [his] job. [He] was precluded from being part of the group."  (*Id.* at 222:8–14).

Flores was suspended on September 6, 2019, and ultimately terminated on September 10, 2019, for stealing ten premade Cuban sandwiches and four Italian sandwiches, multiple two-pound bags of raw shrimp, a sixteen-ounce container of strawberries, a six-ounce container of blueberries, a bag of cooked pasta, a bag of vanilla yogurt; and a bag of granola.  (Doc. 42-1 at 4; Doc. 42-2 at 225:10–23, 226:11–15; Doc. 42-3 at 7–8).  Defendant's Employee Conduct Policy lists theft as grounds for immediate dismissal.  (Doc. 42-1 at 12).

According to Flores, he was not stealing the food but was, instead, transferring it to Drafts, as he had on prior occasions.  (Doc. 42-2 at 226:16–25, 228:20–22, 229:10–14).  Flores put the food in his vehicle in the morning and planned to drive the food to Drafts—which is in the same building as the banquet facility—after his shift.  (*Id.* at 228:13–21, 230:16–19, 235:6–236:6).  Flores recorded the food on a transfer sheet, but he did not have the transfer sheet when he was confronted and asked to write a statement

because the transfer sheets are typically placed "back up on the clipboard." (*Id.* at 229:3–9, 249:17–22).   Flores requested and received a copy later that day from a co-worker named Lorena, whose contact information he could not provide.  (*Id.* at 254:12–256:18; Doc. 42-3 at 42).   Flores did not give Defendant a copy of the transfer sheet prior to his termination.  (Doc. 42-2 at 256:19–257:4).   Although Flores admits that he put the food in his vehicle, he believes that someone working for Defendant set him up so that Defendant could fire him for making the sexual harassment allegations.  (*Id.* at 245:24–247:13).

David Clark testified that Flores routinely transferred food from Westgate Lakes to the Siegel home in his vehicle and he was not always timely with filling out transfer sheets. (Doc. 44-3 at 39:14–40:21, 41:13–25, 42:11–43:1; 46:9–15).   Clark stated he would have "need[ed] to fire half the staff that's in there that does transfers because no one does them on a regular basis."  (*Id.* at 84:7–14).   He admitted, however, that it would not have been appropriate to transfer shrimp in the floor of a vehicle.   (*Id.* at 69:22–70:6).   In addition, at the time Clark was employed with Defendant, food was not transferred between the banquet facility and Drafts because each department did its own ordering. (*Id.* at 67:13–68:6).

Lodge disputes the authenticity of the transfer sheet, notes that it does not account for all the food found in Flores' vehicle, and states that he is not familiar with any employee named Lorena.  (Doc. 42-3 at 10–11).   Moreover, Lodge states that because the banquet facility is connected to Drafts by an elevator, there would have been no need to transfer the food via vehicle.   (*Id.* at 9).   Lodge was not aware that Flores had filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("**EEOC**") when he

terminated Flores for theft and did not became aware of it until September 12, 2019. (Doc. 45-1, ¶¶ 6–7; *see also* Doc. 44-6).

Based on the foregoing, Flores filed the Complaint (Doc. 1) alleging claims under Title VII of the Civil Rights Act ("**Title VII**") , 42 U.S.C. § 2000e *et seq.*, and the Florida Civil Rights Act ("**FCRA**"), Fla. Stat. § 760.01 *et seq.*, as well as claims for gender discrimination, sexual harassment, and retaliation. Defendant seeks summary judgment as to each of his claims.

## II.    LEGAL STANDARD

Summary judgment is appropriate when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it may "affect the outcome of the suit under the governing law."  *Id.*   "The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1313–14 (11th Cir. 2007).  Stated differently, the moving party discharges its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

However, once the moving party has discharged its burden, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324

(quotation omitted).  The nonmoving party may not rely solely on "conclusory allegations without specific supporting facts." *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).  Nevertheless, "[i]f there is a conflict between the parties' allegations or evidence, the [nonmoving] party's evidence is presumed to be true and all reasonable inferences must be drawn in the [nonmoving] party's favor." *Allen*, 495 F.3d at 1314. "Where a party does not respond to the moving party's assertion of a properly supported fact, the Court considers the fact undisputed." *Menster v. Allstate Ins. Co.*, No. 5:19-cv-77-Oc-30PRL, 2020 WL 5534462, at *1 n.1 (M.D. Fla. Aug. 5, 2020) (citing Fed. R. Civ. P. 56(c), (e)).

## III.   DISCUSSION

Defendant argues that it is entitled to summary judgment because Flores' claims are time barred, Flores has failed to set forth a prima facie case of discrimination, and Flores was terminated for a non-pretextual, legitimate reason.

### A.   Statute of Limitations

First, Defendant argues that Flores' sexual harassment claims are time barred because Flores failed to show through admissible evidence that he was subjected to sexual harassment at some moment after August 26, 2018, with respect to his FCRA claims, or October 30, 2018, with respect to his Title VII claims.  Flores argues that his claim is not time barred because he was sexually harassed consistently throughout his tenure until he was transferred out of the Siegel residence in April 2019.

"Section 706 of Title VII requires that a plaintiff . . . exhaust certain administrative remedies before filing a suit for employment discrimination." *Equal Emp. Opportunity Comm'n v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1271 (11th Cir. 2002).  "The

administrative process is initiated by timely filing a charge of discrimination."   *Id.*   In Florida, the charge must be filed within 300 days of the last discriminatory act to be timely for Title VII claims or 365 days for FCRA claims.   *Restrepo v. Int'l Vapor Grp., Inc.*, No. 16-24208-CIV, 2017 WL 2361942, *3 (S.D. Fla. May 26, 2017).   Accordingly, only those claims arising within the prescribed time prior to the filing of the charge of discrimination with the EEOC are actionable.

"[A] hostile work environment, although comprised of a series of separate acts, constitutes one 'unlawful employment practice,' and so long as one act contributing to the claim occurs within the filing period, 'the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.'"   *Watson v. Blue Circle*, *Inc.*, 324 F.3d 1252, 1258 (11th Cir. 2003) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)).   "To claim an extension of the applicable statute of limitations under the continuing violation doctrine, at least one occurrence of harassment must happen within the applicable statute of limitations."   *Scelta v. Delicatessen Support Servs., Inc.*, 89 F. Supp. 2d 1311, 1315 (M.D. Fla. 2000).   When examining a claim of continuing violation, a district court is instructed to consider whether the allegations described as a continuing violation are related by: (1) subject matter; (2) frequency; and (3) permanence.   *See Roberts v. Gadsden Mem'l Hosp.*, 835 F.2d 793, 800 (11th Cir. 1988).

Here, Flores testified that he was sexually harassed by Mrs. Siegel's alleged inappropriate comments, exhibition, and touching from 2016 through 2019.   Flores reported the sexual harassment on numerous occasions and relied on his superiors to address the behavior, but no affirmative action was taken by Defendant until his written

complaint in April 2019.  Flores testified that he told Mrs. Siegel at the end of 2018 or the beginning of 2019 that the harassing behavior had to stop.  This is evidence that the sexual harassment continued until at least the end of 2018, or the beginning of 2019. Further, although he testified that the harassment briefly stopped in 2016 and in 2018, it does not appear that the harassment stopped based on Defendant's corrective measures. As a sister court explained:

> Even a 'reasonably prudent' employee is not likely to conclude that repeated hugging is of the type of activity to trigger his or her rights under Title VII. The continuing violation doctrine focuses on the idea that it is unfair to impose a burden on a prospective plaintiff to file a cause of action when the nature of the ongoing conduct is, without more, insufficient to create a strong case of harassment. Rather, in these milder instances employees should be encouraged to seek their employer's assistance in putting an end to the conduct before it worsens. The record indicates that [the plaintiff] attempted to do just that; the court should not disregard the prior events simply because her supervisor failed to address her pleas.

*Smith v. Auburn Univ.*, 201 F. Supp. 2d 1216, 1224 (M.D. Ala. 2002) (internal citation omitted).  The *Smith* court concluded that "[g]iven the ongoing pattern of which [the plaintiff's] supervisors were aware[,]" the break between the employee's inappropriate behavior did not prevent the court from considering the events preceding the break.  *Id.* Likewise, Flores informed Clark of Mrs. Siegel's behavior on numerous occasions and Clark, in turn, informed Lodge.  According to Mrs. Siegel, she was never approached by Defendant to investigate concerns related to her sexually harassing Flores until he was terminated.  (Doc. 44-1 at 13:1–10, 14:21–24).  Thus, taking the facts in the light most favorable to Flores, Defendant's statute of limitation argument fails at this juncture.

### B.    Sex-Based Discrimination (Counts I and IV)

"Both Title VII and the FRCA prohibit employers from discriminating 'against any individual with respect to his compensation, terms, conditions, or privileges of

employment, because of such individual's . . . sex.'" *Latrece Lockett v. Choice Hotels Int'l, Inc.*, 315 F. App'x 862, 865 (11th Cir. 2009) (quoting 42 U.S.C. § 2000e–2(a)(1); Fla. Stat. § 760.10(1)(a)).  Courts generally apply Title VII case law to FCRA discrimination claims because the FCRA is patterned after Title VII.  *Id.*  Thus, the Court will consider both claims together.

A claim of disparate treatment is evaluated under the *McDonnell Douglas* standard when there is a lack of statistical proof or direct evidence of discrimination.  *Holifield v. Reno*, 115 F.3d 1555, 1561–62 (11th Cir. 1997).  Under this standard, the plaintiff has the initial burden to establish a prima facie case of discrimination.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination."  *Holifield*, 115 F.3d at 1562.  If the plaintiff establishes a prima facie case by a preponderance of the evidence, a presumption of discrimination arises.  *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–54 (1981).

Once the plaintiff has presented a prima facie case and its attendant presumption, the burden "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason" for its actions.  *McDonnell Douglas*, 411 U.S. at 802.  If the employer meets this burden, "the presumption of discrimination is eliminated and the plaintiff has the opportunity to come forward with evidence . . . sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."  *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (quotation omitted).  "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's

articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." *Id.* at 1024–25.  In order to establish a prima face case of discrimination, Flores must demonstrate: (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) his employer treated similarly situated employees outside of his class more favorably; and (4) he was qualified to do the job.  *Stinson v. Pub. Serv. Tel. Co.*, 486 F. App'x 8, 10 (11th Cir. 2012) (citing *McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008)).

It is undisputed that Defendant is a male, his suspension and discharge were adverse actions, and he was qualified.  Defendant argues, however, that Flores has not and cannot identify an employee outside his classification that maintained her job after stealing from Defendant.  Flores responds that Tenerio is a comparator because she is a female who worked in the Siegels' home to provide hospitality services and she was not sexually harassed by Mrs. Siegel.  (Doc. 44 at 10).

Proffered comparators must be "similarly situated in all material respects."  *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1218 (11th Cir. 2019).  "[A] valid comparator: (a) 'will have engaged in the same basic conduct (or misconduct) as the plaintiff;' (b) 'will have been subject to the same employment policy, guideline, or rule as the plaintiff;' (c) will have been 'under the jurisdiction of the same supervisor as the plaintiff,' but not invariably so; and (d) 'will share the plaintiff's employment or disciplinary history.'" *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1326 n.7 (quoting *Lewis*, 918 F.3d at 1227–28).  Here, Tenerio, a female who worked in the Siegel home, was not subjected to the same treatment by Mrs. Siegel as Flores.  However, there is no evidence that Tenerio

stole from Defendant or committed some other terminable misconduct and kept her job. Thus, Flores' claim falters at the first hurdle.

Even assuming Flores has established a prima facie case, Flores is unable to rebut Defendant's legitimate, non-discriminatory reason for terminating his employment. Defendant has the "exceedingly light" burden of articulating a legitimate, non-discriminatory reason for Plaintiff's termination. *Brooks v. Cnty. Comm'n*, 446 F.3d 1160, 1162 (11th Cir. 2006); *Meeks v. Comput. Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994). "An employer may terminate an employee for a bad reason, a good reason, or no reason at all, as long as the reason is not discrimination." *Matthews v. City of Mobile, Ala.*, 702 F. App'x 960, 966 (11th Cir. 2017) (citation omitted). "Courts may not second guess the business decisions of employers nor replace the employers' notions of fair dealing with those of judges." *Id.* Here, Defendant presented evidence that Flores was terminated for stealing food and theft is expressly listed in Defendant's manual as a terminable offense.

Because theft is a legitimate, non-discriminatory reason for termination, the burden shifts back to Flores to introduce probative evidence of pretext. *Brooks*, 446 F.3d at 1163. "A reason is not pretext for discrimination 'unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). Further, pretext cannot be based on speculation, conclusory assertions, or evidence that is merely colorable. *Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). "In determining whether a proffered reason is unworthy of credence, a court will consider 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its

action.'" *Knox v. Roper Pump Co.*, 957 F.3d 1237, 1245 (11th Cir. 2020) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).  For example, "[t]he bending of established rules may . . . be suggestive of discrimination."  *Walker v. Prudential Prop. & Cas. Ins. Co.*, 286 F.3d 1270, 1279 (11th Cir. 2002).

Flores does not deny that he placed the food in his vehicle, but he testified in his deposition that he was transferring the food from the banquet facility to Drafts.  Defendant acknowledges that Flores presented a transfer sheet that accounts for some of the food recovered from Flores' car, but it underscores that the transfer sheet did not account for all the food recovered and the transfer sheet was not provided to Defendant prior to Flores' termination.  It is undisputed that Flores, before he was transferred to Drafts, was authorized to transfer food to the Siegel household in his vehicle.  However, his testimony that he used his vehicle to transfer food from the banquet facility to Drafts is implausible as they are both in the same building.  Thus, it was reasonable for Defendant to reject Flores' explanation and conclude he intended to steal the food.  "[A]n employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct."  *Williams v. Hous. Auth. of Savannah, Inc.*, 834 F. App'x 482, 488 (11th Cir. 2020) (quotation omitted).  "And, in carrying out its business and in making business decisions (including personnel decisions), the employer can lawfully act on a level of certainty that might not be enough in a court of law."  *Id.* (quoting *Equal Emp't Opportunity Comm'n v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176–77 (11th Cir. 2000)).  Based on the foregoing, Flores has failed to rebut Defendant's legitimate, non-discriminatory reason for terminating his employment.  Accordingly, Defendant's Motion will be granted as to Counts I and IV.

**C.      Sexual Harassment (Count II)**

For Flores to prevail on a sexual harassment claim under Title VII and the FCRA he must show: "(1) that [he] belongs to a protected group; (2) that [he] has been subjected to unwelcome sexual harassment; (3) that the harassment was based on [his] sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that a basis for holding the employer liable exists." *Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1244 (11th Cir. 2004) (citations omitted); *see also Lockett*, 315 F. App'x at 865.

Defendant argues that Flores failed to show that his workplace was permeated with discriminatory behavior that was sufficiently "severe" or "pervasive" to create a discriminatorily hostile or abusive working environment.  "Either severity *or* pervasiveness is sufficient to establish a violation of Title VII." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 743 (1998)).  "To qualify as severe <u>or</u> pervasive, the work environment 'must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive,' and one that the victim in fact did perceive to be so.'" *Allen v. Ambu-Stat, LLC*, 799 F. App'x 703, 708 (11th Cir. 2020) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)).  The Court gauges the objective offensiveness of the conduct by considering "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Id.* (quoting *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999)).  The law is clear that "Title VII is not a general civility code," and "general vulgarity or references to

sex that are indiscriminate in nature will not, standing alone, generally be actionable." *Reeves*, 594 F.3d at 808 (quotation omitted).

Sexual harassment in the workplace can alter the terms and conditions of employment if the harassment ends in a "tangible employment action" against the employee or the "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to . . . create an abusive working environment." *Mitchell*, 189 F. App'x at 912 (quotations omitted). "[A] tangible employment action is 'a significant hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hulsey*, 367 F.3d at 1245 (quoting *Burlington Indus., Inc.*, 524 U.S. 742, 753–54 (1998)); *see also Reeves*, 594 F.3d at 807. "An employer is liable under Title VII if it (even unknowingly) permits a supervisor to take a tangible employment action against an employee because [he] refused to give in to [her] sexual overtures. That liability exists regardless of whether the employee took advantage of any employer-provided system for reporting harassment." *Hulsey*, 367 F.3d at 1245. Further, "[c]ourts must 'examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive' to create a hostile working environment." *Dar Dar v. Associated Outdoor Club, Inc.*, 201 F. App'x 718, 721 (11th Cir. 2006) (quoting *Mendoza*, 195 F.3d at 1246).

Although Flores identified a few specific incidents over the span of four years, it can be reasonably inferred from Flores' testimony that the harassing behavior occurred every time Mrs. Siegel was intoxicated. What is more, Mrs. Siegel's behavior goes beyond general vulgarity. Rather, Flores alleges that Mrs. Siegel masturbated in front of

him after telling him he was required to watch her do so, flashed her breasts, and rubbed against his genitalia, the latter occurring with some level of frequency. On at least one occasion Mrs. Siegel threatened Flores' job if he did not relent to her requests. Indeed, after Flores rejected Mrs. Siegel's advances, Mrs. Siegel, for the first time, began making complaints about Flores' cooking and his time on the job to his superiors. Moreover, there is ample record evidence that Plaintiff felt the conduct was sufficiently upsetting that he complained to fellow employees and his superiors on multiple occasions. Thereafter, Flores felt compelled to file a written complaint regarding the behavior. Based on the foregoing, the Court finds that a reasonable jury could find that Mrs. Siegel's conduct was sufficiently severe to create a hostile work environment.

Anticipating such a finding, Defendant argues that summary judgment is warranted based on its *Faragher-Ellerth* defense. "An employer avoids liability under this defense if: (1) it 'exercised reasonable care to prevent and correct promptly any sexually harassing behavior'; and (2) the employee 'unreasonably failed to take advantage of any preventive or corrective opportunities [it] provided.'" *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1303 (11th Cir. 2007) (quoting *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765). While Flores was transferred out of the Siegel's home after he made his formal April 15, 2019 complaint, there is evidence that Flores made earlier complaints directly to Lodge and to Clark, who also related those complaints to Lodge, to no avail. Defendant has failed to direct this Court to any evidence that it took any action on Flores' verbal complaints, that it made any effort to address the behavior, or that it offered Flores any preventative or corrective opportunities. In fact, Flores testified that Lodge told him to simply ignore the harassment and Mrs. Siegel testified that she was never aware that an

allegation had been made while Flores was still working in her home.  Thus, Defendant's Motion will be denied as to Count II.

### D.      Retaliation (Counts III and V)

Finally, Title VII and the FCRA protect an employee against retaliation by their employer because the employee has opposed any practice prohibited thereunder or participated in any manner in any investigation, proceeding, or hearing under Title VII or the FCRA.  *James v. City of Montgomery*, 823 F. App'x 728, 734 (11th Cir. 2020); Fla. Stat. § 760.10(7).  Because there is no direct[2] evidence that Flores was subjected to adverse employment actions in retaliation for his protected activity, the Court utilizes the *McDonnell-Douglas* burden-shifting framework to address the circumstantial evidence before it.  *Id.*  To that end, Flores must first present a prima facie case of retaliation.  To establish a prima facie case of retaliation Plaintiff must demonstrate that 1) he engaged in statutorily protected activity; 2) he suffered an adverse employment action; and 3) there is a causal link between the protected activity and the adverse action.  *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007); *see also Andrews v. Direct Mail Express, Inc.*, 1 So. 3d 1192, 1193 (Fla. 5th DCA 2009).  "In the private-sector context, Title VII makes it unlawful for an employer to discriminate against an employee '*because* he has opposed any practice made an unlawful employment practice by [Title VII], or *because* he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].'"  *Tonkyro v. Sec'y, Dep't of Veterans Affs.*, 995 F.3d 828, 833–34 (11th Cir. 2021) (quoting 42 U.S.C. § 2000e–3(a)).

---

[2] *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) ("Evidence that only suggests discrimination, . . . or that is subject to more than one interpretation . . . does not constitute direct evidence.").

The word "because" requires "proof that the desire to retaliate was the but-for cause of the challenged employment action."  *Id.* (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013)).

Defendant concedes that Flores' suspension and termination are adverse employment actions but argues that there is no causal link between Flores' April 15, 2019 complaint and his suspension and discharge that occurred nearly five months later. Plaintiff counters that he was fired fifteen days after he filed his EEOC complaint on August 26, 2019, thereby establishing a causal connection between his protected activity and his termination based on close temporal proximation.

"A plaintiff can establish a causal relationship between h[is] statutorily protected activity and an adverse employment action by showing a 'close temporal proximity' between the two events."  *Jackson v, Agency for Persons with Disabilities Fla.*, 608 F. App'x 740, 743 (11th Cir. 2015) (quoting *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004)).  However, "[m]ere temporal proximity, without more, . . . must be 'very close.'" *Id.* (quoting *Thomas*, 506 F.3d at 1364).  For example, three to four months between the statutorily protected expression and the adverse employment action is insufficient to support an inference of causation.  *Id.*; *see also Woods v. Escambia Cnty. Utils. Auth.*, 149 F. App'x 863, 866 (11th Cir. 2005) (reiterating that a four-month time span between filing of EEOC complaint and the plaintiff's termination was not sufficiently close to raise any inference of a retaliatory motive).  "If there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law." *Higdon*, 393 F.3d at 1220.

First, Flores's termination is too far removed from the April 15, 2019 complaint to support a causal connection based on close temporal proximity.  Second, although the August 26, 2019 EEOC complaint would close the gap, Lodge's testimony that he did not know about the EEOC complaint when he terminated Flores is uncontroverted.  *Woods*, 149 F. App'x at 867 (finding no causal connection between alleged adverse employment action and EEOC complaint because the supervisor who implemented the adverse employment action was unaware of the EEOC complaint at the time); *Drake-Sims v. Burlington Coat Factory Warehouse of Ala., Inc.*, 330 F. App'x 795, 804 (11th Cir. 2009) (finding the plaintiff failed to rebut her supervisor's testimony that he was unaware of the plaintiff's lawsuit at the time he made the decision to terminate her and other officials' knowledge of the lawsuit could not be imputed to the supervisor).  Last, Flores has presented no evidence other than his feeling that he was fired because of his April 15, 2019 complaint, and as explained above, he has failed to rebut Defendant's legitimate reason for termination.  Accordingly, Defendant's Motion will be granted as to Counts III and V.

## IV.   CONCLUSION

For the reasons set forth herein, it is **ORDERED** and **ADJUDGED** that Defendant's Motion for Summary Judgment (Doc. 42) is **GRANTED in part** as set forth in this Order and **DENIED** in all other respects.

**DONE AND ORDERED** in Orlando, Florida on February 14, 2022.

_____

WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record